UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MARK TERRY BURDICK, deceased, by and through his executrix, BRENDA JUNE BURDICK, and BRENDA JUNE BURDICK, executrix, on behalf of the heirs of MARK TERRY BURDICK, <br><br> Plaintiffs <br><br> vs. <br><br> DYLAN AVIATION, LLC, a Pennsylvania Limited Liability company, ROLLS-ROYCE OF NORTH AMERICA, INC., ROLLS-ROYCE CORPORATION, ALLISON ENGINE COMPANY, STANDARD AERO, INC., STANDARD AERO LIMITED and JOHN DOES I-IV, <br><br> Defendants | Cause No. CV 10-48-BLG-RFC <br><br> **ORDER** |

Currently before the Court is a Motion to Dismiss for Lack of Personal Jurisdiction filed by Defendant Dylan Aviation, LLC. Plaintiffs' oppose said motion. Arguments on this motion were heard May 26, 2011.

**BACKGROUND**

Mark Burdick was killed in a crash involving a helicopter owned by Dylan Aviation, LLC (Dylan) on May 28, 2007. On the day of the crash, Kley Lucas was

piloting the helicopter, and Russell Carey was seated in the front. Burdick was seated in the rear. The three men were performing a visual inspection of a power line in Stillwater County for Montana Power through their employment with Haverfield Corporation (Haverfield). The helicopter was hovering 120 feet above ground level when it lost power and crashed. A fire started a few minutes after impact. Lucas and Carey were seriously injured and Burdick died from blunt traumatic chest injuries and severe burn injuries.

Dylan is a limited liability company whose sole business is buying helicopters and leasing them to Haverfield. Haverfield provides aerial power line inspection and maintenance services throughout the United States. Each member of Dylan is also an employee of Haverfield. At the time of the crash, the seven members of Dylan held titles with Haverfield: Darryl Ed was manager; Brian Parker was executive vice president; Robert Burns was vice president of sales and marketing; Russell Shannon was maintenance manager; Michael Pastovic was project coordinator; Lori Steinour was accounting coordinator; and Christine Cassell was chief financial officer.

Dylan purchase the helicopter – a Hughes 369D, N765HV, in May of 2004. At the time of the purchase, Dylan was doing business as Helibase, LLC. Dylan leased N765HV to Haverfield and Haverfield paid Dylan $250.00 per flight hour, with a guaranteed minimum of 90 hours per month. Dylan and Haverfield later

changed the lease for the purpose of establishing new rent payments, and on March 1, 2005, a second lease took effect. Under the new lease, Dylan received a monthly payment of $12,000, plus $150.00 per flight hour.

As part of the lease, Dylan agreed that N765HV was airworthy, that all the logs, books and records were complete and accurate, and that N765HV was in compliance with all legal requirements. The lease required that Dylan provide the component parts for N765HV. Dylan was also responsible for providing the hardtime and overhauled components.[1] Dylan also had the right to inspect the helicopter and the logs, books and records. Dylan was responsible for ensuring that Haverfield was meeting regulatory commitments.

Dylan is a named insured in the March 1, 2005 lease. Dylan was covered throughout the "continental U.S. and U.S. territories." The insurance policy covers Dylan and provides a settlement up to $100,000 for each passenger for death or bodily injury related to N765HV.

---

[1] A hardtime component is a FAA regulated component that is only allowed so many hours before the part is retired and replaced. Overhauled components are components that can be considered airworthy after an overhaul.

Christine Cassell acted as director of administration for Haverfield and later became chief financial officer of Haverfield. Doc. 38, Ex. A, p. 16. She also acted as a member director of administration of Dylan. *Id.* at 11. Cassell testified at her deposition that Dylan had "general knowledge" of where Haverfield was doing business. *Id.* at 78. When Cassell prepared the formation documents for Dylan (formed as Helibase), she utilized Haverfield's computers to do so. *Id.* at 34. When Cassell assisted with the preparation of tax returns for Dylan, she was being paid by Haverfield. *Id.* at 35. And Dylan's records for N765HV are maintained in Haverfield's office, only in a different filing cabinet. *Id.* at 75.

Dylan received the insurance proceeds from the totaled helicopter. *Id.* at 73. The insured value of N765HV was $400,000. Despite the fact that the lease required Haverfield to give written notice of a loss, Haverfield did not do so because "the principals were the same." *Id.* at 74.

In March of 2007, Dylan began a corporate restructuring in which the ownership of Dylan was "rolled into" a new company, Haverfield Holdings Corporation. Haverfield Holdings Corporation was to be the sole shareholder of Harverfield International, Inc. (formerly Haverfield Corporation), which, at the same time, because the sole member of Dylan. Based upon the Amended and Restated Limited Liability Company Agreement of Dylan Aviation, LLC, Haverfield stopped

making lease payments to Dylan on March 31, 2007. The Amended and Restated Limited Liability Company Agreement of Dylan Aviation, LLC, specifically provided Dylan Aviation, LLC was formed for the purpose of: "own[ing] and operat[ing] rotary aircraft engaged in power line inspection and repair, and related fields. . ." *See Plaintiff's Exhibit L at Bates No. DA0377.* On June 13, 2007, all of Dylan's helicopters were transferred to Haverfield, except N765HV. Accordingly, N765HV was owned by Dylan at the time of the crash on May 28, 2007 and no lease payments had been made since March 31, 2007.

After evaluating the evidence presented by Plaintiff, and considering the extensive corporate interrelationship between Dylan and Haverfield, it is apparent that Dylan knew where Haverfield was doing business on May 28, 2007.

## ANALYSIS

### I. Jurisdiction

In determining whether this Court has personal jurisdiction, two questions must be asked: first, whether an applicable state statute potentially confers jurisdiction; second, whether assertion of such jurisdiction comports with due process. *Plant Food Co-op v. Wolfkill Feed & Fertilizer Corp.*, 633 F.2d 155, 157 (9th Cir. 1980). Personal jurisdiction can be either general or specific. *Threlkeld v. Colorado*, 2000 MT 369, ¶ 10, 303 Mont. 432, 16 P.3d 359.

When a court considers a motion to dismiss for lack of personal jurisdiction on affidavits and discovery materials alone, "a plaintiff need only make a prima facie showing of jurisdictional facts to defeat the motion." *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1071 (9th Cir. 2001). If the facts are in conflict, any conflict must be resolved in the plaintiff's favor when considering a motion to dismiss. *Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003).

### A. General Jurisdiction

General jurisdiction exists over "[a]ll persons found within the state of Montana. . ." *See* Rule 4B(1), M.R.Civ.P.; *Simmons Oil Corp. v. Holly Corp.* (1990), 244 Mont. 75, 83, 796 P.2d 189, 194. A nonresident defendant is "found within" Montana for general jurisdiction purposes if its activities in the state are either "substantial" or "continuous and systematic ." *Simmons Oil Corp.*, 244 Mont. at 83, 796 P.2d at 194 (citations omitted). If a nonresident defendant derives "substantial" economic benefit, then a nonresident defendant can still be found within Montana for general jurisdiction purposes. *Threlkeld v. Colorado*, 2000 MT 369, ¶ 14, 303 Mont. 432, 16 P.3d 359. If general jurisdiction does not exist, the court may still exercise specific jurisdiction over a defendant.

B. **Specific Jurisdiction**

Specific jurisdiction arises from one of the six activities found in Mont.R.Civ.P. 4B(1).

> (1) Subject to jurisdiction. All persons found within the state of Montana are subject to the jurisdiction of the courts of this state. In addition, any person is subject to the jurisdiction of the courts of this state as to any claim for relief arising from the doing personally, through an employee, or through an agent, of any of the following acts:
>
> (a) the transaction of any business within this state;
>
> (b) the commission of any act which results in accrual within this state of a tort action;
>
> (c) the ownership, use or possession of any property, or of any interest therein, situated within this state;
>
> (d) contracting to insure any person, property or risk located within this state at the time of contracting;
>
> (e) entering into a contract for services to be rendered or for materials to be furnished in this state by such person; or
>
> (f) acting as director, manager, trustee, or other officer of any corporation organized under the laws of, or having its principal place of business within this state, or as personal representative of any estate within this state.

Specific long-arm jurisdiction is appropriate over nonresident defendants when "the alleged tort accrued in Montana." *Bunch v. Lancair International, Inc.*,

2009MT 29, ¶ 40, 349 Mont. 144, 202 P.3d 784.  There is no doubt that Burdick's tort claims accrued in Montana.

C. **Traditional Notions of Fair Play and Substantial Justice**

If specific or general jurisdiction exists, the exercise of jurisdiction must not offend "traditional notions of fair play and substantial justice." *Simmons Oil Corp.*, 244 Mont. at 85, 796 P.2d at 195.  In *Simmons v. State*, 206 Mont. 264, 276, 670 P.2d 1372, 1378 (1983), the Montana Supreme Court adopted the Ninth Circuit test for determining whether the exercise of jurisdiction comports with due process:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking its laws.
>
> (2) The claim must be one which arises out of or results from the defendant's forum-related activities.
>
> (3) The exercise of jurisdiction must be reasonable.

*See Simmons Oil Corp. v. Holly Corp.*, 244 Mont. 75, 85, 796 P.2d 189, 195 (Mont. 1990).

"The plaintiff need not demonstrate each of the above three elements to establish jurisdiction.  Once the plaintiff shows that the defendant has purposefully availed itself of the privilege of conducting activities in the forum, a presumption of reasonableness arises, which the defendant can overcome only by 'presenting a

compelling case that jurisdiction would be unreasonable.'" *Simmons Oil Corp v. Holly Corp.,* 244 Mont. at 85, citing *Brand v. Menlove Dodge*, 796 F.2d 1070, 1074 (9th Cir.1986).

**1.     Has Dylan Purposely Availed Itself of the Montana Forum?**

"A nonresident defendant purposefully avails itself of the benefits and protections of the laws of the forum state when it takes voluntary action designed to have an effect in the forum." *Simmons Oil Corp.*, 244 Mont. at 86, 796 P.2d at 195, citing *Boit v. Emmco Ins. Co.*, 271 F.Supp. 366, 369 (D.Mont.1967). *See also Farmers Ins. Exch. v. Portage La Prairie Mutual Ins. Co.*, 907 F.2d 911 (9th Cir.1990). Conversely, a defendant does not purposefully avail itself of the forum's laws when its only contacts with the forum are random, fortuitous, or attenuated or due to the unilateral activity of a third party. *Simmons Oil Corp.*, 244 Mont. at 86, 796 P.2d at 195, citing *Brand*, 796 F.2d at 1074. The defendant that invokes the laws of the forum state by purposefully availing itself of the privilege of conducting activities within the forum should reasonably anticipate being haled into court in the forum state. Therefore, the exercise of jurisdiction over such a defendant is fundamentally fair. *Simmons Oil Corp.*, 244 Mont. at 86, 796 P.2d at 195.

Dylan engaged in the affirmative conduct of leasing N765HV to Haverfield, with the knowledge that N765HV would be used in "the continental U.S. and U.S.

territories." *See Plaintiff's Exhibit G at Bates No. DA130.* N765HV was not brought into Montana by the unilateral act of a disinterested third party. Instead, N765HV was brought into Montana by the members of Dylan, who are also the managers of Haverfield. Dylan was very aware of the actions of Haverfield because the decision makers for both companies are the exact same. Dylan's contact with Montana was voluntary and financially beneficial to Dylan.

Dylan's business enterprise is to purchase helicopters so that its parent corporation, Haverfield, can use them throughout the United States. Dylan does not lease helicopters to anyone except Haverfield. Dylan's attempt to minimize physical contacts with Montana through the use of Haverfield does not alter the "basic existence of [Dylan's] involvement in, and its pecuniary benefit from, a full exploitation of the market." *See Gullett v. Qantas Airways, Ltd.*, 417 F.Supp. 490, 496 (M.D. Tenn. 1975).

Dylan's argument that it is not physically located in Montana is not sufficient to defeat personal jurisdiction. Jurisdiction "may not be avoided merely because the defendant did not physically enter the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Therefore, "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, [courts] have

consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.*

Dylan also argues that it did not control or direct where the helicopter was used or flown. This argument fails. The corporate interrelationship between Dylan and Haverfield is such that Haverfield knew what Dylan was doing and Dylan knew what Haverfield was doing. The members of Dylan were the officers of Haverfield. When asked whether Haverfield gave Dylan "notice of loss" as required by the lease during the deposition of Christine Cassell, she responded it was not necessary because "the principals were the same." Doc. 38, Ex. A, p. 74.

Dylan cannot claim surprise at being brought into a Montana Court. Dylan leased the helicopters to Haverfield for use "in the continental U.S. and U.S. Territories." Dylan was insured for liability related to N765HV in the continental United States. Additionally, Dylan derived financial benefits from lease payments and insurance proceeds resulting from the use of N765HV in Montana. These facts are sufficient to establish purposeful availment.

Further, the Amended and Restated Limited Liability Company Agreement of Dylan Aviation, LLC, which went into effect as of March 29, 2007, specifically provided Dylan Aviation, LLC was formed for the purpose of: "own[ing] and operat[ing] rotary aircraft engaged in power line inspection and repair, and related

fields. . ." *See Plaintiff's Exhibit L at Bates No. DA0377.* On June 13, 2007, all of Dylan's helicopters were transferred to Haverfield, except N765HV. Accordingly, N765HV was owned by Dylan at the time of the crash on May 28, 2007 and no lease payments had been made since March 31, 2007.

An unpublished opinion from Hawaii demonstrates this point and is comparable to this situation. In *Pacific Fisheries Corp v. Power Transmission Products, Inc.*, 2000 WL 1670917 (D. Hawai'i 2000), Pacific Fisheries filed suit in Hawaii as a result of an explosion involving a steel ammonia tank stored on the deck of a fishing vessel which was located in Hawaii. Pacific Fisheries owned the fishing vessel and alleged that defendant Airgas owned the tank and leased it to another defendant, Power Transmission, a few years before the accident. Power Transmission allegedly subleased the tank to Pacific Fisheries. Pacific Fisheries claimed that Airgas and/or Power Transmission asked another defendant, Oxarc, to fill the tank with ammonia, that the tank was overfilled, and that the tank was thereby rendered dangerously defective. *Id.* at *1. Plaintiff filed suit seeking exoneration of its liability due to the acts of the defendants. *Id.* Power Transmission moved to dismiss for lack of personal jurisdiction.

The court held Power Transmission purposefully availed itself of the privilege of conducting activities in Hawaii because it "'knew or should have known' that the

ammonia tank would be transported to Hawaii." *Id*. at *6. The court concluded it was "not a unilateral act by Pacific that brought the ammonia tank to Hawaii. The tank was brought to Hawaii because Power Transmission subleased it to Pacific and allowed it to be brought here." *Id.* Additionally, the court concluded "Power Transmission received a direct economic benefit by subleasing the ammonia tank to Pacific and allegedly authorizing its transport to Hawaii." *Id.* Therefore, due to Power Transmission's "ownership interest in property located in Hawaii when the [fishing vessel] took the ammonia tank there . . . Power Transmission affirmatively availed itself of the privilege and benefit of having its equipment stored and operated in Hawaii." *Id.* Thus, "Power Transmission should have reasonably anticipated being haled into court in Hawaii." *Id.*

### 2. Does the Burdick Estate's Cause of Action Arise out of Forum Related Activities?

The second prong asks whether the claims arose out of or resulted from forum-related activities. The Ninth Circuit relies on a "but for" test to determine whether a particular claim arises out of forum-related activities and thereby satisfies the second requirement for specific jurisdiction. *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1075 (9th Cir. 2001), citing *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir.

1995). Plaintiffs must show that they would not have suffered an injury "but for" Defendant's forum related conduct. *See id.*

But for Dylan's purchasing and leasing N765HV to Haverfield, as well as the corporate interrelationship with Haverfield, N765HV would not have been leased to Haverfield and Burdick would not have been in Montana and killed in the crash. It is reasonable to infer that Dylan's affirmative acts and associations with Haverfield was a "but for" cause of Dylan's helicopter being in Montana.

### 3. Is the Exercise of Jurisdiction over Dylan Reasonable?

The third prong of the due process analysis requires that the exercise of jurisdiction must be reasonable. In *Jackson v. Kroll, Pomerantz and Cameron*, 223 Mont. 161, 166, 724 P.2d 717, 721 (1986), the Montana Supreme Court enumerated several factors to be considered when examining the reasonableness of jurisdiction:

> 1. The extent of defendant's purposeful interjection into Montana;
>
> 2. The burden on defendant of defending in Montana;
>
> 3. The extent of the conflict with the sovereignty of defendant's state;
>
> 4. Montana's interest in adjudicating the dispute;
>
> 5. The most efficient resolution of the controversy;
>
> 6. The importance of Montana to plaintiff's interest in convenient and effective relief; and

      7. The existence of an alternative forum.

*Simmons Oil Corp.*, 244 Mont. at 87-88.

      These factors are not mandatory tests, each of which the plaintiff must pass in order for the court to assume jurisdiction. Rather, the factors simply illustrate the concept of fundamental fairness, which must be considered in each jurisdictional analysis. *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1332 (9th Cir.1984), cert. denied, 471 U.S. 1066, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985).

      When considering the extent of personal interjection into Montana, Dylan leased helicopters to Haverfield knowing that they would be used all over the "continental U.S. and U.S. Territories." Additionally, Dylan received lease payments from Haverfield for the N765HV, as well as insurance proceeds from the totaled helicopter.

      Dylan argues that it would be burdensome to defend this action in Montana because it is also defending the claims of two passengers from the same incident in Pennsylvania. The Court does recognize that it is easier to try a case all at once. However, given the ability of the parties to commute easily with air travel and communication is always accessible with the latest advances in technology, the burden is not so great as to require dismissal of this matter.

Third, Dylan has not shown a conflict of laws between Montana and Pennsylvania. The claims against Dylan will require the application of Montana law.

With regard to the forum state's interest in adjudicating the dispute, Montana is interested in protecting and regulating the conduct of parties who do business within the state, even if the parties are not residents of the state. *See Simmons Oil Corp.*, 244 Mont. at 89. The crash occurred in Montana, the investigation occurred in Montana, and the damaged remains of N765HV are stored in Montana.

When considering the most efficient judicial resolution, this does not weigh in favor of either party. The pilot of N765HV is a resident of Michigan. The post-crash investigation occurred in Bozeman and Indianapolis, Indiana. The totaled helicopter is stored in Montana. At least one NTSB investigator was from Montana and the NTSB "investigator-in-charge" was from the Western region of the United States. Mark Burdick's executrix is a resident of Tennessee, and the other Defendants are incorporated in states other than Montana and Pennsylvania.

The sixth consideration is convenience and effectiveness for Plaintiff. Montana is an effective forum. Under Montana law, Burdick has the potential to recover damages for lost earnings, the present value of his reasonable earnings during his life expectancy, medical and funeral expenses, compensation for pain and

suffering, and other special damages. *Swanson v. Champion Intern. Corp.*, 197 Mont. 509, 515 646 P.2d 1166, 1169. There is not an offset of lost future earnings for economic consumption. *Payne v. Eighth Jud. Dist. Ct.*, 2002 MT 313, ¶ 10, 313 Mont. 118, 60 P.3d 469. Montana law also compensates heirs for the damages they personally suffered as a result of the decedent's death. *Swanson, 197 Mont. at 517, 646 P.2d at 1170.* Furthermore, under Montana law, any subrogation right is not recognized until the claimant has been "made whole." *State Compensation Ins. Fund v. McMillan*, 2001 MT 168, ¶ 7, 306 Mont. 155, 31 P.3d 347. These considerations support the conclusion that Montana is the most effective forum for Burdick.

The seventh consideration is the existence of an alternative forum. This is neutral to both parties because there is an alternative forum.

**D.   Dylan's Reliance on 49 U.S.C. § 44112 is Misplaced.**

Dylan argues extensively in the briefing that it cannot be held liable because federal law prohibits liability against a lessor or owner of a civil aircraft. Title 49 U.S.C. § 44112 states as follows:

> (a) Definitions.--In this section–
>
> (1) "lessor" means a person leasing for at least 30 days a civil aircraft, aircraft engine, or propeller.
>
> (2) "owner" means a person that owns a civil aircraft, aircraft engine, or propeller.

(3) "secured party" means a person having a security interest in, or security title to, a civil aircraft, aircraft engine, or propeller under a conditional sales contract, equipment trust contract, chattel or corporate mortgage, or similar instrument.

(b) Liability.--A lessor, owner, or secured party is liable for personal injury, death, or property loss or damage on land or water only when a civil aircraft, aircraft engine, or propeller is in the actual possession or control of the lessor, owner, or secured party, and the personal injury, death, or property loss or damage occurs because of--

(1) the aircraft, engine, or propeller; or

(2) the flight of, or an object falling from, the aircraft, engine, or propeller.

The application of the statute to the facts in this case is not a jurisdictional question. Dylan's reliance on 49 U.S.C. § 44112 at this time is misplaced.

## CONCLUSION

Plaintiff has made the prima facie showing of jurisdictional facts to defeat the motion to dismiss. Any facts that appeared to be in conflict at the hearing must be resolved in the plaintiff's favor when considering this motion.

Therefore, based upon the foregoing, Dylan is subject to specific Montana jurisdiction and Dylan's motion to dismiss is **DENIED**.

DATED this 17th day of June, 2011.

*/s/ Richard F. Cebull*_____
RICHARD F. CEBULL
U.S. DISTRICT COURT JUDGE